UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONICA WHOOLEY,<br><br>             Plaintiff,<br><br>   v.<br><br>TAMALPAIS UNION HIGH SCHOOL<br>DISTRICT, et al.,<br><br>             Defendants. | Case No. 18-cv-07686-RS<br><br><br>**ORDER GRANTING IN PART AND<br>DENYING IN PART TAMALPAIS<br>DISTRICT'S MOTION TO DISMISS<br>AND GRANTING YOSHIHARA'S<br>MOTION TO DISMISS** |

## I. INTRODUCTION

Monica Whooley, the mother and successor-in-interest to her son, Gabriel, maintains that

he committed suicide because Tamalpais Union High School District (the "District") and its

former superintendent, David Yoshihara (collectively "Defendants"), failed to implement his

accommodation plan pursuant to section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

(the "504 Plan"). Whooley charges Defendants with violations of numerous federal and state

laws. The District and Yoshihara separately move to dismiss, asserting none of Whooley's causes

of action adequately state a claim for relief. This matter is suitable for disposition without oral

argument pursuant to Civil Local Rule 7-1(b). For the reasons explained below, the District's

motion is granted only as to Whooley's first and eighth causes of action with leave to amend and

is otherwise denied, while Yoshihara's motion is granted in its entirety with leave to amend.

## II. BACKGROUND[1]

In 2014, during Gabriel's eighth grade year, he was assessed by Ross Valley School District ("RVSD") and found eligible for special education owing to a specific learning disability arising from his significant processing weaknesses and high anxiety related to academics. Upon reassessment, he was found ineligible for special education, but concerns remained regarding his processing skills and anxiety. RVSD then placed Gabriel on a section 504 accommodation plan ("504 Plan") pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 794. The 504 Plan included numerous accommodations to meet Gabriel's needs, including regular one-on-one checks with teachers and extra time on tests.

Beginning in the Fall of 2014, Gabriel was enrolled in Drake High School in the Tamalpais District. He remained on the 504 Plan throughout his time at Drake, but the District purportedly never re-evaluated Gabriel for his 504 Plan. As he progressed through high school, Gabriel became increasingly overwhelmed by mounting pressure from the school to achieve and maintain a high grade point average, to attain high scores on the ACT or SAT exams, and to complete early enrollment period applications for colleges. This stress was allegedly compounded by the District's employees failing to implement his 504 Plan on numerous occasions.

In one instance, Gabriel was scheduled to take the Advanced Placement ("AP") test in English Language and Composition in May 2017. Pursuant to his 504 Plan, Gabriel was to be placed in a separate room away from other students and given the test by a different proctor. On the day of the test, however, he was told that there was no proctor available to administer his test, thereby forcing him to take the test in the school's gymnasium with the other students. When Gabriel informed her of this breach of his 504 Plan, Whooley contacted members of Drake's staff to ensure his accommodations were in place and would be implemented for the ACT in June 2017. Whooley also contacted the College Board and was told to request that Drake file an incident

---

[1] The factual background is based on the averments in the Complaint, which must be taken as true for purposes of this motion.

report regarding what occurred during the AP test.

Shortly after the AP exam, Gabriel suffered a sudden spontaneous pneumothorax, meaning one of his lungs partially collapsed. Whooley informed all of Gabriel's teachers, his academic counselor, and Drake's 504 Plan coordinator that he would be out of school for a few days and requested that they send class notes and assignments. Whooley never received a response. She then contacted the assistant, Jolie Jacobs, to Drake's principal, Liz Seabury, in order to inform the principal of Gabriel's condition and to ensure that his teachers were apprised of the need for extra accommodations due to his health. Jacobs refused to inform Seabury of Gabriel's health concerns. In light of Gabriel's continuing symptoms of pneumothorax, Whooley sent Drake a note from his doctor requesting that he be given reasonable academic accommodations to facilitate his recovery. Whooley again received no response from Drake employees.

A few days before the ACT, Gabriel contacted Kyle Elsman, the Drake staff member responsible for handling accommodation requests, to confirm that his accommodations were in place. After receiving no response, Gabriel contacted the ACT organization itself to discover that Drake had not filed the appropriate paperwork on his behalf, despite Elsman's confirmation in March 2017 that Gabriel had provided all of the proper paperwork to process his request. Drake and the District subsequently attempted to secure the proper accommodations for the ACT, but were only able to do so for the September exam. This would preclude Gabriel from being able to complete early enrollment period applications for colleges. Additionally, Gabriel had received a scholarship for tutoring for the June ACT that did not carry over to the September 2017. In order to retain the information he had learned over the course of his tutoring, Gabriel had to continue studying over the summer of 2017. Drake and the District refused to cover the cost of the additional three months of tutoring.

The night before the September ACT, Gabriel told Whooley that he was growing increasingly stressed about school. Whooley then contacted Gabriel's academic counselor, Sheila Souder, and asked if there were any counselors at Drake with whom Gabriel could speak. Souder assured Whooley that she would complete a Wellness Referral for Gabriel and would follow-up

with her soon.  The Wellness Referral was not made.  Subsequently, in October 2017, Gabriel suffered from another pneumothorax.  Gabriel informed his teachers and academic counselors that he would be out of school and requested extra time and support to complete his assignments, but received no response.

In November 2017, Gabriel's Advanced Placement Chemistry teacher and tutor commented that his stress levels were rising due to his having to miss class for health reasons. They recommended that Gabriel drop the class, even though that would mean he would receive a failing grade in the course.  Whooley alleges that despite the chemistry teacher's awareness of his health issues, she refused to give him the extra time to prepare for a test he missed when he was out of school for a doctor's appointment.  Additionally, Whooley generally avers the chemistry teacher refused to follow Gabriel's 504 Plan and allow him extra accommodations for time.  She also generally pleads another unnamed teacher routinely mocked Gabriel for his constant anxiety over achieving the best grades.

On the night of December 13, 2017, Gabriel informed his mother that he would be pulling his first "all-nighter" to study for a chemistry test and a Spanish final exam the next day.  Between 3:00 AM and 6:00 AM on December 14, Gabriel hung himself in his bedroom.

### III.  LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  While "detailed factual allegations" are not required, a complaint must have sufficient factual allegations to state a claim that is "plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  This standard asks for "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  The determination is a context-specific task requiring the court "to draw on its judicial experience and common sense."  *Id.* at 679.

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil

Procedure tests the legal sufficiency of the claims alleged in the complaint.  *See Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011).  Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory."  *Id.* at 1242 (internal quotation marks and citation omitted).  When evaluating such a motion, the court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party.  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017).  "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim."  *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 812 (9th Cir. 2010) (internal quotation marks and citation omitted).

## IV.  DISCUSSION

### A.  Mixing Defendants Together

The Complaint is critically deficient for all of Whooley's causes of action against Yoshihara because she improperly mixes Yoshihara with the District by accusing them of the same conduct and holding them collectively liable.  The Complaint, however, contains no facts stating *what* acts Yoshihara committed and *how* his individual conduct caused Whooley harm.  There is virtually no detail about Yoshihara's interaction with Whooley or Gabriel, nor anything to infer that Yoshihara played any role with the accused District personnel to cause either Whooley or Gabriel injury.  Indeed, in *Walsh v. Techachapi Unified Sch. Dist.*, 827 F. Supp. 2d 1107, 1116 (E.D. Cal. 2011), a defendant superintendent's motion to dismiss was granted because he could "only be held liable for his own individual actions" under *Iqbal*, and the plaintiff had failed to allege any facts directed at the superintendent.  Here, Whooley effectively concedes this point by failing to address it in her Opposition, opting instead to assert that Yoshihara rejected three separate offers from the California Department of Education for free youth mental health training for teachers the year before California Education Code section 215 was codified.  This allegation was not made in the Complaint, however, and so it cannot be considered for the purposes of this motion.  Moreover, contrary to Whooley's contentions, Yoshihara may not be held liable for the

1  actions of District personnel based only on the simple fact of his service as superintendent of the

2  school district. Since the Complaint conclusorily alleges the sheer possibility that Yoshihara acted

3  unlawfully in conjunction with the District, all of Whooley's claims must be dismissed as to

4  Yoshihara. *Iqbal*, 556 U.S. at 679.

5  **B. California Education Code § 215**

6  California Education Code section 215, which became effective at the start of the 2017-

7  2018 school year, requires that school districts serving students in grades 7-12 adopt a policy on

8  pupil suicide prevention. Whooley claims the District violated this statute by failing to adopt such

9  a policy and is therefore liable for her son's suicide. The District counters that dismissal is

10  necessary because the statute does not explicitly establish a private right of action, nor can such a

11  right be implied under California law. Additionally, the District contends Whooley has failed to

12  allege how the District's violation of section 215 caused her injury by causing Gabriel to take his

13  life. Only the latter argument is persuasive.

14  To start, there is an explicit private right of action under the statute. Section 215 falls

15  under chapter 2 (Educational Equity) of the state education code. Under Article 9 (Enforcement)

16  of that chapter, there is a provision expressly authorizing enforcement of chapter 2's provisions

17  through a civil action. Cal. Educ. Code § 262.4. Thus, Whooley may bring suit to enforce this

18  statute, and there is no need to determine whether such a right is implied.

19  That said, Whooley's cause of action under this statute must be dismissed. Her

20  overarching theory of liability against the District is that its repeated failures to implement

21  properly Gabriel's 504 Plan drove him to commit suicide. Nowhere in the Complaint, however,

22  does Whooley allege that the District's failure to adopt a policy on pupil suicide prevention, itself,

23  played a role in fostering this tragedy. Therefore, this claim is dismissed with leave to amend.

24  Yoshihara argues Whooley should not be given leave to amend her section 215 claim

25  against him[2] for two reasons: (1) there is no private right of action under the statute and (2) the

26

27  [2] It is unclear from the Complaint if Whooley asserts this cause of action against both the District
   and Yoshihara. Nevertheless, Yoshihara's arguments are considered, as the analysis will provide

28

statute imposes a duty upon the governing body of a school district and not specifically on the superintendent. The first argument fails for the reasons just explained. The latter argument also fails, but for different statutory reasons.

At first glance, there appears to be some support for Yoshihara's position. Section 215 is directed to the "governing board or body of a local education agency" and does not mention any official of that agency, including superintendents. Chapter 2 defines "educational institution" as "a public or private preschool, elementary, or secondary school or institution; the governing board of a school district; or any combination of school districts or counties recognized as the administrative agency for public elementary or secondary schools." Cal. Educ. Code § 210.3. The "governing board" is helpfully defined as "the governing board of a school district." Cal Educ. Code § 211. Neither definition includes a district official, let alone a superintendent. Additionally, section 250 places the responsibility upon an educational institution to provide assurance to sources of state financial assistance that each program or activity conducted by the educational institution is conducted in compliance with the provisions of Chapter 2. Cal. Educ. Code § 250. Moreover, elsewhere in the California statutory code, the legislature has expressly differentiated between liability on the part of public entities and liability on the part of public entity employees. *Compare* Cal. Gov. Code § 815 (liability of public entities), *with* Cal. Gov. Code § 820 (liability of public entity employees).

Finally, when the legislature has seen fit expressly to impose a duty specifically on a superintendent, it has done so elsewhere in the Education Code. *See* Cal. Educ. Code § 64001(e)("Onsite school and district compliance reviews of categorical programs shall continue, and [School Plan for Student Achievements] shall be required and reviewed as part of these onsite visits and compliance reviews. The Superintendent shall monitor such compliance. To that end, the Superintendent shall develop . . . ."); *see also* Cal. Educ. Code § 35035 (titled "[a]dditional powers and duties of superintendent"). There is, however, a statutory provision that permits the

---

guidance to Whooley in amending her complaint, should she choose to do so.

governing board of a school district to delegate to a district officer or employee any of the powers

or duties delegated to the governing board by law (though the governing board retains ultimate

responsibility over the performance of those delegated powers or duties). Cal. Educ. Code

§ 35161. Such delegation presumably could include the mandate to formulate and adopt a suicide

prevention policy under section 215. It is unclear from the pleadings whether such delegation was

made to Yoshihara. Accordingly, if factually supportable, Whooley should be accorded the

opportunity to allege the governing board of the District delegated its duty, pursuant to section

35161, to adopt a suicide prevention policy under section 215 to Yoshihara such that he could be

held liable for violation of that statute.

### C. Supervisory Liability Under 42 U.S.C. § 1983

Yoshihara asserts supervisory personnel cannot be held liable under section 1983 for the

actions of their employees under the theory of *respondeat superior*. *Walsh*, 827 F. Supp. 2d at

1116 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). Rather, supervisors can be

held liable under section 1983 "only if they play an affirmative part in the alleged deprivation of

constitutional rights." *Graves v. City of Coeur D'Alene*, 339 F.3d 828, 848 (9th Cir. 2003)

(internal quotations omitted), *abrogation on other grounds recognized in Thomas v. Dillard*, 818

F.3d 864, 885 (9th Cir. 2016). The Complaint indeed fails to allege that Yoshihara did anything,

let alone played an affirmative role in purportedly depriving Whooley and her son's constitutional

rights. That is not enough, on its own, to warrant dismissing her constitutional causes of action

with prejudice. It is not clear from the pleadings that it is entirely impossible for Whooley to

allege facts to support the reasonable inference that Yoshihara did play an affirmative role in the

deprivation of constitutional rights. The Ninth Circuit provides a liberal standard for granting

leave to amend deficient complaints, particularly where there have been no prior amendments or

motions to dismiss. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2009)

(reversing and remanding to the district court plaintiff's motion to amend where plaintiff already

amended his complaint three times, but sought leave of court in good faith to meet with the court's

heightened pleading requirements). While it is not readily apparent that further amendment can

cure the defects discussed above, at the same time the record does not demonstrate such an effort would be futile.

**D.  Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**

Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]"  29 U.S.C. § 794.  To establish a prima facie case of disability discrimination, Whooley must show that Gabriel: (1) was an individual with a disability; (2) was otherwise qualified to participate or receive the benefit of some public entity's services, programs, or activities; (3) was either excluded from participation or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; (4) such exclusion, denial of benefits, or discrimination was by reason of his disability; and (5) the relevant program receives federal financial assistance.  *E.R.K. ex rel. R.K. v. Hawaii Dep't of Educ.*, 728 F.3d 982, 992 (9th Cir. 2013).

Whooley bears the burden of proving disability within the meaning of the statute.  *Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1063 (9th Cir. 2005).  Additionally, to recover monetary damages she must show the discrimination was intentional, *Duvall v. Cty. of Kitsap*, 260 F.3d 1125, 1138-39 (9th Cir. 2001), or that the culpable entity acted with deliberate indifference. *Mark H. v. Hamamoto*, 620 F.3d 1090, 1099 (9th Cir. 2010).  An educational organization acts with deliberate indifference if it (1) had knowledge that a harm to a federal protected right is substantially likely and (2) failed to act upon that likelihood.  *Mark H.*, 620 F.3d at 1099.  The District asserts dismissal of Whooley's section 504 claim is necessary because her pleadings do not address how any of the alleged actions by the District violated section 504 or clarify whether she seeks damages for the purported failure to implement Gabriel's 504 Plan or that the purported failure to implement the accommodations caused Gabriel to commit suicide.  Neither warrants dismissal of Whooley's cause of action.

The Ninth Circuit's decision in *Mark H.* is controlling here.  In that case, the court held it

United States District Court
Northern District of California

was enough if: (1) the students needed autism-specific services to enjoy meaningful access to the benefits of a public education; (2) the state was on notice that the students needed those autism-specific services but did not provide them; and (3) autism-specific services were available as a reasonable accommodation. *Mark H.*, 620 F.3d at 1097-98. The Ninth Circuit further held that the culpable educational entity acted with deliberate indifference if it knew the students needed autism-specific services in order to enjoy meaningful access to the benefits of a public education and failed to investigate whether those services were available as a reasonable accommodation. *Id.* at 1099. This mirrors the situation here. Gabriel was entitled to certain services, such as testing accommodations, because of his learning disability. The District was on notice as to the need for those accommodations because it knew Gabriel was on a section 504 plan. The District failed to investigate whether services such as extra time and separate spaces for testing were available as a reasonable accommodation. Alleged facts reflecting such failure include the lack of a proctor to administer Gabriel's AP English exam in a separate room or to confirm the submission of the appropriate accommodation documents for the June ACT test. Whooley has sufficiently alleged the District acted with deliberate indifference in violating section 504 and so her claim may proceed.[3]

**E. Article I, Section 7 of the California Constitution**

In general, California's equal protection clause as embodied in Article I, Section 7 of its Constitution does not provide a private right of action for monetary damages for alleged violations of the clause. *Javor v. Taggart*, 98 Cal. App. 4th 795, 807 (2002). A plaintiff, however, may state a claim for damages under Article I, Section 7 if the claim is tied to an established common law or statutory cause of action. *See Julian v. Mission Cmty. Hosp.*, 11 Cal. App. 5th 360, 391 (2017). As discussed above, Whooley sufficiently pleads a cause of action under section 504, and so she

---

[3] Since Whooley has sufficiently alleged a section 504 violation, she may seek damages for the District's purported failure to implement Gabriel's 504 Plan. The District argues that it is unclear whether she seeks damages for the alleged failure to implement Gabriel's 504 Plan or that the purported failure to implement the accommodations caused Gabriel to commit suicide. The Complaint, however, is sufficiently clear with regards to the former.

may seek monetary damages under the California Constitution.

**F. Unruh Civil Rights Act (California Civil Code §§ 51, 51.5, 52)**

California's Unruh Act secures equal access to public accommodations and prohibits discrimination by "all *business establishments* of every kind whatsoever." Cal. Civ. Code § 51(b) (emphasis added). Whether a defendant is a "business establishment" for purposes of the Act is a question of law. *Rotary Club of Duarte v. Bd. of Dirs.*, 178 Cal. App. 3d 1035, 1050 (1986). The District's primary argument for dismissal here is that a school district is not a business establishment for the purposes of the Unruh Act.

The California Supreme Court has not squarely addressed this question and federal district courts in California have differed in their conclusions. *Compare Yates v. East Side Union High Sch. Dist.*, No. 18-cv-02966-JD, 2019 WL 721313 (N.D. Cal. Feb. 20, 2019) (holding a school district qualifies as a "business establishment" under the Unruh Act), *with Zuccaro v. Martinez Unified Sch. Dist.*, No. 16-cv-02709-EDL, 2016 WL 10807692, at *9-13 (N.D. Cal. Sep. 27, 2016) (holding they do not). The California Supreme Court, however, has explained that the term "business establishment" should be construed "in the broadest sense reasonably possible." *Isbister v. Boys' Club of Santa Cruz, Inc.*, 40 Cal. 3d 72, 78 (1985) (internal quotation marks omitted). The Act applies to an organization that is "classically 'public' in its operation," namely one that "opens its . . . doors to the entire youthful population" of a city, or a "broad segment of the population," with "no attempt to select or restrict membership or access on the basis of personal, cultural, or religious affinity, as private clubs might do." *Id.* at 81, 84 (emphasis omitted).

In keeping with this broad reading, California courts have applied the Act not just to for-profit commercial establishments, but also to nonprofit institutions. *See O'Connor v. Village Green Owners Ass'n.*, 33 Cal. 3d 790, 796 (1983) ("Nothing in the language or history of its enactment calls for excluding an organization from its scope simply because it is nonprofit."). The Act, however, generally does not apply to a private social club, such as a private religious school that is "an expressive social organization whose primary function is the inculcation of values in its youth members," and whose admission policies are "effectively selective and based on these

values." *Doe v. Cal. Lutheran High Sch. Ass'n.*, 170 Cal. App. 4th 828, 838 (2009) (internal quotations omitted) (citing *Curran v. Mt. Diablo Council of the Boy Scouts*, 17 Cal. 4th 670, 699 (1998)). In essence, the Act is concerned with equal access to places of public accommodation. *See Warfield v. Peninsula Golf & Country Club*, 10 Cal. 4th 594, 618 (1995).

The District does not dispute Drake High School is a public operation that provides educational services to the local community at no cost to the individuals it serves. In fact, it insists that its existence as a nonprofit provides a strong reason to infer that school districts should not qualify as "business establishments" under the act. The California Supreme Court, however, has applied the Unruh Act to nonprofit organizations. *See Warfield*, 10 Cal. 4th at 599; *O'Connor*, 33 Cal. 3d at 796. The California appellate cases relied upon by the District and the district court in *Zuccaro* are readily distinguishable. Neither *Carter v. City of Los Angeles*, 224 Cal. App. 4th 808 (2014), nor *Gregory v. County of Los Angeles*, No. B251945, 2014 Cal. App. Unpub. LEXIS 8358 (Nov. 21, 2014), dealt with public schools with their "quintessential character of providing public accommodations and services to students." *Yates*, 2019 WL 721313, at *2; *see Carter*, 224 Cal. App. 4th at 825 (in dictum casting doubt on challenge to city's sidewalk construction); *Gregory*, 2014 Cal. App. Unpub. LEXIS 8358, at *13-15 (holding a county animal shelter was not functionally equivalent to a commercial enterprise to warrant classifying it as a "business establishment" under the Unruh Act).

Consequently, the reasoning in *Yates* is more persuasive and the District may constitute a "business establishment" under the Unruh Act. *See Yates*, 2019 WL 721313, at *3. In *Yates*, the court found this conclusion squares with the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, which unquestionably applies to public schools. *Yates*, 2019 WL 721313, at *3 (citing *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 749 (2017); *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1094 n.1 (9th Cir. 2013) ("[A] violation of the ADA is, *per se*, a violation of the Unruh Act." (internal quotations omitted))). Since courts analyze claims under section 504 using the same standards as claims under Title II of the ADA, *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999), this conclusion is similarly in accord with section

504, which also certainly applies to public schools.

Finally, the District contends that even if the Act applies, Whooley has not alleged any discriminatory intent on the part of the District, nor any causal link between Gabriel's suicide and any alleged adverse action on the part of the District. Furthermore, for reasons discussed below with regard to the common law torts, the District asserts suicide is an intervening event that breaks the chain of causation, thereby precluding tort liability. Both arguments fail for the reasons discussed above with regard to the section 504 cause of action. Accordingly, Whooley's cause of action under the Unruh Act may proceed.

### G. Negligence

Whooley argues the District's conduct negligently caused Gabriel's suicide. Under California law, "[t]he elements of negligence are: (1) defendant's obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty); (2) failure to conform to that standard (breach of the duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages)." *McGarry v. Sax*, 158 Cal. App. 4th 983, 994 (2008) (internal quotations omitted). The District contends (1) it had no duty affirmatively to prevent Gabriel's suicide and (2) Gabriel's suicide was an intervening cause that broke the chain of causation, negating the element of proximate cause. Whooley counters the District's conduct gave Gabriel (1) an uncontrollable impulse to commit suicide and (2) the District had a special relationship with Gabriel that gave rise to a specific duty to prevent a foreseeable suicide.

Both parties appear to conflate their arguments regarding Whooley's pleadings and the negligence factors of duty and proximate cause. As discussed with regard to her section 215 claim, Whooley's overarching theory of liability against the District is that its repeated failures to implement properly Gabriel's 504 Plan drove him to commit suicide, but she fails to allege how the District's failure to adopt a suicide prevention policy, itself, caused any harm to Gabriel or to Whooley. The former is relevant to whether the District's actions instilled an uncontrollable impulse to commit suicide in Gabriel, while the latter is relevant to whether the District had a

specific duty to prevent a foreseeable suicide by one of its pupils. The distinction is critical, as courts have widely recognized that a breach of this specific duty may result in tort liability for a suicide, even if the suicide was volitional and does not satisfy the uncontrollable impulse test. *Walsh v. Tehachapi Unified Sch. Dist.*, 997 F. Supp. 2d 1071, 1085-86 (E.D. Cal. 2014) (and collecting cases). Within this framework, the District's contentions that it had no duty to prevent Gabriel's suicide are appropriately addressed with regard to whether a school district has such a specific duty, and not with respect to whether Whooley has plead sufficient facts to satisfy the uncontrollable impulse test. Indeed, the District cites to no case law suggesting that a school district has no duty to refrain from fostering in its students an uncontrollable impulse to end their lives. The District also does not disclaim a duty to implement properly Gabriel's 504 Plan.

    *1. Uncontrollable Impulse*

        Proximate cause, or legal cause, is absent where an intervening act or event breaks the chain of causation between the defendant's conduct and the plaintiff's injuries as a matter of law. *Lombardo v. Huysentruyt*, 91 Cal. App. 4th 656, 665-66 (2001). In California, suicide has historically been viewed as an intervening event that always breaks the chain of causation, thereby precluding any tort liability for a suicide. *Tate v. Canonica*, 180 Cal. App. 2d 898, 901-03 (1960). An exception is where the defendant's negligence causes the decedent to suffer from an uncontrollable impulse to commit suicide. *Id.* at 913-15. The underlying rationale for this exception is that absent volition, the decedent's act of suicide is not independent from the defendant's original negligence. Therefore, in order to satisfy the uncontrollable impulse test, a plaintiff must show that a defendant's negligence causes the decedent to suffer a mental condition in which the decedent cannot control his or her suicidal impulses. *Id.* at 915. On the other hand, if the decedent was able to control such impulses and had the ability to refrain from committing suicide, then it would be a superseding event that breaks the chain of causation between the defendant's negligence and the death. *Id.*

        Whooley has pled enough facts to satisfy the uncontrollable impulse test. The Complaint avers the repeated negligence of the District's employees in accommodating Gabriel's disability

caused him extreme anxiety and mental harm.  It can be reasonably inferred that this anxiety and mental anguish created an uncontrollable impulse in Gabriel to commit suicide.  The lack of any sort of warning or pronouncement from Gabriel regarding his suicidal ideation is dispositive here. Unlike *Corales v. Bennett*, 567 F.3d 554, 573 (9th Cir. 2009), where the court noted the decedent "had the opportunity to appreciate the nature of his actions" because, among other things, he wrote a "detailed suicide note before committing suicide," or *Lenoci v. Leonard*, 189 Vt. 641, 645 (Vt. 2011), where the court held there was no evidence to establish that the decedent had an uncontrollable impulse to commit suicide since she frankly communicated her intention to commit suicide to her friends and family and executed her suicide plan in a deliberate matter, there is no evidence here to suggest Gabriel planned his suicide, discussed it with friends or family, or left any note before hanging himself.  Moreover, whether Gabriel suffered from an uncontrollable impulse to end his life appears to be a question of fact that is inappropriate to decide at the pleading stage.  *See Corales*, 567 F.3d at 572-73 (holding plaintiffs had failed to raise a triable issue of fact as to proximate cause); *Walsh*, 997 F. Supp. 2d at 1082 (finding plaintiff had demonstrated a genuine dispute of fact regarding the uncontrollable impulse test that could not be resolved on summary judgment).

Both the District and Yoshihara counter that they are immune from liability under California Education Code section 44808, which provides that "no school district . . . or any officer or employee of such district or board shall be responsible or in any way liable for the conduct or safety of any pupil of the public schools at any time when such pupil is not on school property[.]"  According to Defendants, since Gabriel's suicide occurred off-campus, it cannot be held liable for the death.  This argument misses the mark.  Since the alleged negligent acts occurred on school grounds, the fact that the suicide ultimately occurred elsewhere cannot shield Defendants from liability as a matter of law for their purported bad acts on campus.

Similarly, the District's citation to California Government Code section 815(a) also fails to shield it from liability.  Section 815(a) immunizes public entities from liability for injuries arising from its acts or omissions except as provided by statute.  Cal. Gov. Code § 815(a).  Section 815.2

is one such statute. It provides: "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee." Cal. Gov. Code § 815.2(a). As the District recognizes in its motion, school districts are vicariously liable for injuries proximately caused by the negligence of school personnel responsible for student supervision on school grounds. *Hoff v. Vacaville Unified Sch. Dist.*, 19 Cal. 4th 925, 932-34 (1998). Whooley has pled such negligence on the part of District personnel responsible for implementing Gabriel's 504 Plan on school grounds, and therefore the District may be vicariously liable for its personnel's negligence.

Finally, the District's contention that the allegedly negligent conduct at issue cannot give rise to liability because it occurred over a period of months instead of years is unpersuasive. The District points to no authority suggesting negligence must last for a minimum duration of time before it can satisfy the uncontrollable impulse test; it focuses instead on whether the decedent suffered an uncontrollable impulse to commit suicide and if the defendant's negligence caused the uncontrollable impulse. Indeed, Whooley pleads the time period at issue was a particularly stressful span of months, during which high school students were preparing their college applications and examinations. Accordingly, the uncontrollable impulse theory of liability is no impediment to Whooley's negligence theory.

### 2. *Specific Duty*

Whooley's negligence claim, however, may not proceed under her specific duty theory of liability. Primarily relying upon *Walsh*, Whooley asserts the District had a specific duty to prevent Gabriel's foreseeable suicide. Under California law, there is generally no duty to prevent suicide unless there is a special relationship between the defendant and the decedent that gives rise to such a duty. *See Nally v. Grace Cmty. Church*, 47 Cal. 3d 278, 293 (1988). Courts have imposed a duty to prevent suicide only where the defendant has physical custody and substantial control over a person or where the defendant has special training or expertise in mental illness and has sufficient control over a person to prevent the suicide. *Walsh*, 997 F. Supp. 2d at 1085. Typically,

United States District Court
Northern District of California

such defendants are a prison, jail, or hospital. *Id.* Under such circumstances, the defendant has a custodial relationship over others that uniquely place the defendant in a position to detect and prevent suicide. *Id.* at 1086.

It is unclear whether a duty to prevent suicide could similarly be imposed on a school. Whooley does not cite to any California state court case explicitly imposing such a duty on a school district or its employees. *Cf. Nally*, 47 Cal. 3d at 299 (indicating that a duty to prevent suicide has "heretofore" only been imposed on psychiatrists and hospitals caring for suicidal patients). Even *Walsh* only assumed the existence of such a duty for the purposes of its analysis finding a plaintiff failed to produce sufficient evidence to show a school district had breached that duty. *Walsh*, 997 F. Supp. 2d at 1088. The court in *Walsh* did conclude that a strong argument could be made to support imposition of a duty to prevent suicide based on the special relationship California courts have found between a school and its students. *Id.* at 1086. This special relationship is premised on the idea that school personnel stand *in loco parentis* to their students and not only have authority to exercise comprehensive control over them, but are expected to take "all reasonable steps" to protect its students from harm. *Id.* (quoting *J.H. v. L.A. Unified Sch. Dist.*, 183 Cal. App. 4th 123, 142 (2010)).

*Walsh* concluded plaintiff had not provided sufficient evidence to show that defendants breached a duty to prevent a foreseeable suicide because there was nothing to suggest the decedent's suicide was foreseeable. *Id.* at 1087-88. Such is the case here. Even assuming the District had a duty to prevent the foreseeable suicide of one of its pupils, the Complaint is devoid of any facts to suggest that Gabriel was suicidal or why it should have been apparent to the District that his suicide was *likely* or foreseeable. Indeed, Whooley does not aver that she herself thought that Gabriel was suicidal. *Cf. Id.* at 1088 ("It is telling that [p]laintiff, who was aware of the bullying at school as anyone else, conceded that she herself never thought that [d]ecedent was depressed or suicidal. A juror would be hard-pressed to turn around and find that [d]efendants knew any better."). She does not allege facts reasonably to infer why the District should have thought differently.

Moreover, *Walsh* assumed that school personnel generally are not trained in detecting or treating mental illness, and so California courts would not hold a school and its employees to a higher standard of care than medical professionals.[4] *Id.* at 1086. Whooley contends the subsequent passage of section 215 does impose such a higher standard of care upon school personnel and that, in combination with the special relationship between the District and Gabriel, the District's knowledge that it was required to implement the suicide prevention policies mandated by section 215, and its notice that Gabriel was a high-risk student for whom section 215 was specifically meant to protect imposed a duty on the District to prevent Gabriel's suicide. While it is not readily apparent that the California legislature intended to impose the same standard of care upon school personnel as medical professionals trained in diagnosing mental illness with the passage of section 215, even assuming that it did, Whooley's section 215 claim fails for the reasons already discussed. Furthermore, the standard for medical professionals requires awareness of facts from which they could reasonably conclude the patient was *likely* to commit suicide in the absence of preventative measures. *Meiter v. Ross Gen. Hosp.*, 69 Cal. 2d 420, 424 (1968). As discussed above, there are no facts to infer the District should have known that Gabriel's suicide was likely or foreseeable. Consequently, Whooley's negligence claim, to the extent it is based upon the District having a specific duty to prevent the foreseeable suicide of a pupil, is dismissed with leave to amend.

### 3. *California Government Code Section 820.2*

Yoshihara contends permitting Whooley to amend her pleadings as to him would be futile because there are no facts as to negligence she can allege that would satisfy proximate cause so, even crediting the improperly pled allegation regarding Yoshihara's refusal to accept the mental

---

[4] In California, medical professionals have a duty to take reasonable steps to prevent suicide if (1) they are charged with the care of a patient and (2) they "know of facts from which they could reasonably conclude that the patient would be likely to harm himself in the absence of preventative measures[.]" *Meiter v. Ross Gen. Hosp.*, 69 Cal. 2d 420, 424 (1968); *see also Walsh*, 997 F. Supp. 2d at 1086 n.5 (noting courts that have imposed a duty to prevent suicide in the prison or jail context have applied the same standard).

health training for the District's teachers, it is a discretionary decision entitled to immunity under California Government Code section 820.2. Yoshihara further argues his refusal of the training cannot be seen as giving rise to an uncontrollable impulse to commit suicide as a matter of law. The first argument fails for the reasons discussed above with regard to the uncontrollable impulse test. The remaining arguments likewise fail to warrant denying Whooley the opportunity to repair her Complaint.

There is nothing to suggest amendment would be futile, as Whooley may be able to allege Yoshihara's rejection of the mental health training was not a discretionary decision entitled to statutory immunity, but a mandatory duty pursuant to a California statute. In that situation, Yoshihara would not be shielded from liability. Even then, Yoshihara has cited to no authority to suggest that he would have any statutory immunity for conduct prompting an uncontrollable impulse to commit suicide in any of the District's pupils.

**H. Wrongful Death (California Code of Civil Procedure § 377.60)**

To state a claim for wrongful death, a plaintiff must plead (1) the tort (negligence or other wrongful act), (2) the resulting death, and (3) the damages, consisting of the pecuniary loss suffered by the heirs. *Lattimore v. Dickey*, 239 Cal. App. 4th 959, 968 (2015). The parent of a dependent minor has standing to pursue such a claim. Cal. Code Civ. P. § 377.60. The District misreads *Majors v. Merced Cty.*, 207 Cal. App. 2d 427, 439 (1962) and its discussion of *Tate* in noting the uncontrollable impulse exception does not give rise to liability where the act of the defendant was intentionally done, but there was no intent to cause injury. The District interprets this to mean Whooley cannot allege in good faith that the District engaged in conduct that was intended to cause Gabriel to take his own life, an obligation Whooley does not shoulder. As previously discussed, the California court of appeal in *Tate* held if a negligent wrong causes mental illness which results in an uncontrollable impulse to commit suicide, then the wrongdoer may be held liable for the death. *Tate*, 180 Cal. App. 2d at 915. Whooley has sufficiently pled facts to satisfy the uncontrollable impulse test, and so her claim for wrongful death may proceed.

### I. Bystander Emotional Distress

Whooley's last cause of action is for "bystander emotional distress," an apparent variant of a claim for negligent infliction of emotional distress to a bystander. A plaintiff must satisfy three requirements to state such a claim: (1) the plaintiff must be closely related to the injury victim; (2) the plaintiff must have been present at the scene of the injury-producing event at the time it occurred and was then aware that it was causing injury to the victim; and (3) as a result, the plaintiff must have suffered serious emotional distress. *Thing v. La Chusa*, 48 Cal. 3d 644, 667-68 (1989). The District asserts Whooley cannot satisfy the second requirement as she was not present at the injury-producing event when it occurred. The District identifies Gabriel's act of hanging as the injury-producing event and appears to argue the event ended with Gabriel's death. In the Complaint, Whooley identifies separate injury-producing events when she avers she: (1) witnessed, saw, and perceived discrimination towards Gabriel, and (2) was present, witnessed, saw, and perceived Gabriel hanging from Gabriel's neck, yet neither include facts reflecting her presence at either injury-producing event.

With regard to her averred witnessing of Gabriel's discrimination, it is unclear if California courts recognize a cause of action for negligent infliction of emotion distress where the injury-producing event causes a purely mental injury as opposed to a physical one. Indeed, the cases discussed by the parties involved a plaintiff witnessing only physical injuries that were inflicted upon a loved one. In a separate opinion resolving summary judgment with regard to claims for bystander negligent infliction of emotional distress, the court in *Walsh* dealt with a student's suicide, but only with regard to the physical hanging itself, as the plaintiff in that case did not argue otherwise and the court did not discuss the potential effect on a bystander of observing the school district's failure to prevent bullying of the decedent. *Walsh v. Tehachapi Unified Sch. Dist.*, No. 1:11-cv-01489-LJO-JLT, 2013 WL 4517887, at *4 & n.2 (E.D. Cal. Aug. 26, 2013). Even assuming a cause of action can exist where the observed injury is entirely non-physical, Whooley fails to allege that she was present at any of the identified events where the District failed to implement properly Gabriel's 504 Plan. For example, she does not allege that she was

present at the AP Exam where Gabriel was informed his needs could not be accommodated, on the phone call where Gabriel confirmed that the District had not submitted the appropriate paperwork to secure accommodations for the ACT, or that she was present during any of the AP chemistry teacher's comments. Whooley does allege that she experienced emotional distress directly from the District ignoring her attempts to ensure Gabriel's 504 Plan was properly implemented. A parent can assert an intentional or negligent infliction of emotional distress cause of action as a direct victim of a defendant's negligent act regarding her child, instead of for injuries based upon the parent's direct observation of the injury. *Zuccaro*, 2016 WL 10807692, at *8-9. The Complaint, however, specifically frames Whooley's cause of action as a *bystander*, and not as a direct victim of the alleged harm by the District. Moreover, Whooley's observation of the incidents where Gabriel suffered from a collapsed lung do not alter the analysis, as she does not aver the condition flowed from the anxiety or stress he was experiencing.

As for Whooley's observation of Gabriel hanging by his neck in his bedroom, the reasoning in *Walsh* is instructive. There, the court found the plaintiff's claim for negligent infliction of emotional distress could survive summary judgment because at the point of discovery the decedent was still alive (albeit unconscious and immobile) and therefore the noose and act of hanging continued to inflict injury on the decedent in plaintiff's presence. *Walsh*, 2013 WL 4517887, at *5-6. The court noted, however, that the analysis would be different if there was medical evidence indicating the decedent was already dead or brain dead at some point before plaintiff arrived on the scene. *Id.* at *5 n.5. Here, Whooley has not alleged that Gabriel was alive at the time she discovered him hanging in his bedroom. Therefore, this claim is dismissed with leave to amend.[5]

---

[5] The District makes the argument that since negligent infliction of emotional distress is not a tort cause of action independent from negligence, it may not be pled contemporaneously with a negligence cause of action. The cases invoked by the District, however, simply stand for the proposition that a negligent infliction of emotional distress cause of action cannot lie where there is no negligence, and so the negligence analysis governs where both negligence and negligent infliction of emotion distress claims are alleged. None of the cases the District cites prohibit raising both claims contemporaneously.

## V. CONCLUSION

For the foregoing reasons, the District's motion is granted only with regard to Whooley's section 215, negligence (to the extent it is based on the theory the District had a specific duty to prevent a foreseeable suicide), and bystander negligent infliction of emotional distress claims with leave to amend. Yoshihara's motion is granted in its entirety with leave to amend. In the event that Whooley elects to file an amended complaint, she must do so within 21 days of the date of this order.[6]

**IT IS SO ORDERED**.

Dated: July 29, 2019

_____
RICHARD SEEBORG
United States District Judge

[6] Both the District and Yoshihara are reminded to comply with the local rules requiring all PDFs to be filed in a searchable text format in all future filings. *See* L.R. 5-1(e)(2).

United States District Court
Northern District of California